**In re GOLDBLATT BROS., INC., including previously separated entities f/k/a 1980 Broadland Building Corporation and Spar Realty Indiana Corp., Debtors.**

Bankruptcy No. 81 B 7075.

United States Bankruptcy Court,
N.D. Illinois, E.D.

Oct. 9, 1991.

Max Chill, Steven R. Radtke, Chill, Chill & Radtke, P.C., Chicago, Ill., for Creditors' Committee.

Jeffrey W. Linstrom, Jones, Day, Reavis & Pogue, Chicago, Ill., for Field Enterprises, Inc.

Daniel R. Murray, Donald R. Cassling, Frances Gecker, Jenner & Block, Chicago, Ill., for JG Industries, Inc. (f/k/a Goldblatt Bros., Inc.)

## AMENDED MEMORANDUM OPINION ON MOTION OF CREDITORS' COMMITTEE FOR FINAL DISTRIBUTION

JACK B. SCHMETTERER, Bankruptcy Judge.

Under the debtor's Chapter 11 Plan confirmed in 1983, the Creditors' Committee is responsible for distribution of funds provided by the Plan for payment to unsecured creditors. A dividend of about 25.1% is due to those creditors. Millions of dollars have been paid out to them, but something in excess of $750,000 (after estimated final fees and taxes due) remains for creditors whose whereabouts are presently unknown.

Under 11 U.S.C. § 347(b) of the Bankruptcy Code,

(b) Any security, money, or other property remaining unclaimed at the expiration of the time allowed in a case under

Chapter 9, 11 or 12 of this title for the presentation of a security or the performance of any other act as a condition to participation in the distribution under any plan confirmed under Section 943(b), 1129, 1173 or 1225 of this title, as the case may be, becomes the property of the debtor or of the entity acquiring the assets of the debtor under the plan, as the case may be.

Pursuant thereto, on June 21, 1991, the Committee proposed a public advertisement to find the missing creditors, and that the money of those not found by November 30, 1991, be paid to the reorganized Goldblatt Bros., Inc.

Two issues are presented in this context and have been briefed by the reorganized Debtor and Field Enterprises, Inc., a major unsecured creditor:

1. Under 11 U.S.C. § 347(b) what will be *the expiration of the time allowed in a case under Chapter ... 11 ... of this title for the ... performance of any ... act as a condition to participation in the distribution under ... plan confirmed under Section ... 1129 ..."*? (Emphasis supplied.) Is it the five years after confirmation provided under § 1143?

2. Should the balance of unclaimed funds go to the reorganized debtor or be reallocated among unsecured creditors whose whereabouts are known, as Field Enterprises argues?

*Factual Background*

This case was filed by Debtor under Chapter 11 of the Bankruptcy Code nine years ago.

Over eight years ago, on August 23, 1983, the court confirmed Debtor's Second Amended Plan of Reorganization (the "Plan"). Pursuant to the Plan, the Debtor made its requisite deposit into the Creditors' Deposit Account, in complete settlement, satisfaction and discharge under the, Plan of all Class 3 Allowed Claims of unsecured creditors. Section 1 of Plan Article IV provided that, after payment of (a) Administrative Claims, (b) Class 2 Allowed Claims and (c) the Committee's reasonable expenses of administration, "all amounts which remain in the Creditors' Deposit Account shall be paid pro rata to Class 3 Creditors *in accordance with their Percentages."* (Emphasis supplied.) The Disclosure Statement further explained this provision by stating that, after payment of the Administrative and Class 2 Claims and the reasonable expenses of the Committee, "all amounts which remain in the Creditors' Deposit Account will be paid by the Creditors' Committee pro rata to Class 3 Creditors *in accordance with the percentage of the aggregate unpaid Class 3 Allowed Claims held by each such Creditors."* (Emphasis supplied.)

The Debtor funded the Creditors' Deposit Account from a certain Mortgage Loan authorized under the confirmed Plan.[1] The Disclosure Statement explicitly provided that "[a]ny proceeds of the Mortgage Loan which are not used to enable the Debtor to effectuate the Plan will be available for use as working capital in the Debtor's continued business operations after confirmation of the Plan." *See* Disclosure Statement at p. 10.

The Creditors' Committee disbursed most of the Creditors' Deposit Account to unsecured creditors. On June 14, 1991, the Committee filed a motion seeking authorization to make a final distribution of the $3,400,000 then remaining in the Creditors' Deposit Account, and of that remaining sum to return any unclaimed funds from the Creditors' Deposit Account to the Debtor on or before November 30, 1991 (the "Unclaimed Funds"). The Unclaimed Funds consist of uncashed checks and checks that were undeliverable due to presently insufficient addresses, many creditors having moved or lost touch with the case

1. The Plan authorized Debtor and its wholly-owned subsidiary, Goldblatt Subsidiary, Inc. ("GS"), to enter into a Merger and Joint Venture Agreement with Jupiter Industries and its subsidiaries, Jupiter Subsidiary A, Inc. ("JSA"), J.G. Investments, Inc. ("JI") and J. Gold Corporation ("JG"). Pursuant to the Merger and Joint Venture Agreement, GS merged with JSA, JI made the Debtor a loan secured by the Debtor's real estate (the "Mortgage Loan"), and the Debtor, the post-merger surviving company, and JG entered into a joint venture agreement.

during the long years that this case has pended.

Field objects to the Committee's distribution of the Unclaimed Funds to Debtor because such a distribution allegedly (a) would violate the "intent" of the Plan, (b) would result in "an unanticipated and unwarranted windfall" to the Debtor, and (c) is not mandated by Section 347(b) of the Bankruptcy Code. For the reasons stated below, Field's objections are overruled.

*Section 347(b) Requires Return of the Unclaimed Funds to the Debtor*

Field argues that Section 347(b) of the Code does not mandate return of unclaimed property to the Debtor, where the unclaimed property is situated in a fund that has been established "solely for the benefit of certain creditors." (Field Objection, at 7.) Field claims that Section 347(b) deals only with situations in which a plan of reorganization "has not otherwise addressed the distribution of remaining property." (*Id.*) Under the circumstances of this case, Field "believes the intent of the Plan is that all funds in the Creditors' Deposit Account should be distributed to creditors," so that, "[g]iven this intent, there is no need to resort to the provisions of section 347(b) to determine what to do with the funds in the Creditors' Deposit Account." (*Id.*).

If Field's argument were correct that Section 347(b) applies only to "situations in which a plan of reorganization has not otherwise addressed the distribution of remaining property,"[2] then that Section would be robbed of meaning. Under many Chapter 11 plans, funds are specifically earmarked for creditors and are intended under the plans to be distributed to creditors. Some individuals among those creditors often cannot be found at time of distribution. Field's argument therefore proves too much; if followed, that position would effectively gut Section 347(b).

Section 347(b), as supplemented by Section 1143, furthers the very important Congressional goals of ensuring finality,[3] judicial economy and the avoidance of disruptive, wasteful litigation over funds which remain unclaimed five years after confirmation. 2 Collier on Bankruptcy ¶ 347.02 (15th ed. 1991).

These goals are expressed in statutory language which is clear and mandatory. Thus, Section 347(b) states that

"[a]ny security, money, or other property remaining unclaimed at the expiration of the time allowed in a case under Chapter ... 11 ... for the presentation of a security or the performance of any other act as a condition to participation in the distribution under any [confirmed] plan ... *becomes the property of the debtor or the entity acquiring the assets of the debtor under the plan, as the case may be.*" (Emphasis supplied).

■ That statute provides a clear bright-line rule that unclaimed funds are automatically to be returned to the Debtor. Congress thereby ensured that estates could be closed without costly, protracted litigation over undistributed funds among the Debtor, its creditors under the Plan, or State treasurers under State laws of escheat. *See, e.g., In re George Rodman, Inc.,* 50 B.R. 313, 314 (Bankr.W.D.Okla.1985); 2 Collier on Bankruptcy ¶ 347.02 (15th ed. 1991). If Field's argument were accepted, Congress' goal in Section 347(b) would be directly thwarted.

These principles have been well recognized by the courts, when similar fact situations have arisen. For example, in *In re George Rodman, Inc.,* 50 B.R. 313 (Bankr. W.D.Okla.1985), the Trustee, like the Committee in this case, was unable to locate some creditors and sought to distribute the unclaimed funds to the known unsecured creditors. The court denied the Trustee's

---

**2.** Field Objection, at 7.

**3.** In fact, if Field's argument were correct, it would become virtually impossible to achieve finality of distribution in cases with many creditors. As unclaimed funds would be redistributed to creditors which had accepted distributions, a certain number of those "redistribution" checks would become newly undeliverable, due to changes in addresses or creditor status over the years. These newly undeliverable checks would then require a new recomputation of new redistributions, leading to newly returned "redistribution checks" and so on, *ad infinitum.*

motion and held that the Trustee must hold the unclaimed funds for five years from the confirmation date under Section 1143, and then distribute the unclaimed funds under Section 347(b) to the debtor or the entity which acquired the debtor's assets. *Rodman*, 50 B.R. at 314.

Just as the *Rodman* court was compelled to follow the dictates of the Code, so must this Court. Field has shown no authority which could allow this Court to disregard the clear mandate of Section 347(b).

### The Plan and Disclosure Statement Provide for Return of Unclaimed Funds to the Debtor.

Assuming without deciding that the Plan could override the express requirements of Section 347(b), Field has failed to demonstrate that such was intended in this case. Indeed, the Plan and Disclosure Statement refute Field's interpretation.

The distribution language in Section 1 of Plan Article IV and the related distribution language in the Disclosure Statement both emphasized that each Class 3 Allowed Claimant is entitled to receive from the Creditors' Deposit Account only that portion which is equal to its pro rata amount, determined by reference to "the aggregate unpaid Class 3 Allowed Claims held by each such Creditor." The definition of Class 3 claims in Article I of the Plan,[4] and the definition of Allowed Claims in the definitional section of the Plan [5] make clear that the pro rata percentage recovery of each unsecured creditor is determined by reference to all of the estate's unsecured creditors, not just those to whom distribution is ultimately made. Certainly, nothing

in the plan or disclosure statement expresses any intent that some unsecured creditors should receive more than their pro rata dividend.

Other provisions of the Plan and Disclosure Statement also indicate Plan intent to return to Debtor any proceeds of the Mortgage Loan not used to effectuate the Plan. Disclosure Statement, p. 10. The proceeds of the Mortgage Loan funded the Creditors' Deposit Account. Once the final distribution occurs, the Plan will have been effectuated. Upon effectuation, the Plan and Disclosure Statement made clear that any proceeds of the Mortgage Loan not used for Plan payments will become property of the Debtor. Consequently, the Unclaimed Funds must revert to the Debtor.

Field premises part of its argument regarding the Plan's intent on certain Plan provisions relating to the Goldblatt's Deposit Account, a wholly separate fund established to pay priority tax claims. The Disclosure Statement stated that the Committee "will pay any amount remaining in the Goldblatt's Deposit Account to the Debtor." Disclosure Statement, p. 8. The Plan provided that the Committee would return Goldblatt's Deposit Account remainder funds to the Debtor, while no such provision was directly expressed for the Creditors' Deposit Account. From this Field argues that the Plan did not intend to return the Creditors' Deposit Account's Unclaimed Funds to the Debtor. In the light of other Plan provisions discussed and § 347(b), however, this argument is without merit.

4. Class 3 Claims are defined as "Allowed Claims not entitled to secured status pursuant to section 506 of the Code or to priority pursuant to section 507 of the Code, including, without limitation, the amount by which the Allowed Claim of a Secured Creditor exceeds the value of such Secured Creditor's interest in Goldblatt's interest in the Collateral or the amount subject to setoff, and claims arising from the rejection of executory contracts and unexpired leases."

5. An "Allowed Claim" is defined in the Plan as "[a] claim (i) a proof of which is filed within the time fixed by the Court or, if the claim arose out of the rejection of an executory contract or

unexpired lease, within the time fixed by the Court or as provided in Article VIII of the Plan or (ii) that has appeared, or hereafter appears, in the schedules filed by Goldblatt under section 521(1) of the Code, except a claim that is scheduled as disputed, contingent or unliquidated as to amount and, in each case, to which no objection to the allowance thereof has been filed within any applicable period fixed by the Court, or as to which the order of Court allowing such claim has become final and nonappealable and no appeal therefrom is pending. 'Allowed Claim' shall not including any Administrative Claim."

### Return of the Unclaimed Funds Will Not Create an Unwarranted Windfall to the Debtor.

Despite full disclosure to creditors that excess proceeds of the Mortgage Loan would revert to the Debtor, Field asserts that any such return creates "an unanticipated and unwarranted windfall to the Debtor." Field's resort to equity is wholly misplaced. If equity were for this Court to decide, it would seem inequitable to distribute the Unclaimed Funds to some unsecured creditors, who will thereby receive more than the pro rata distribution they anticipated, rather than to return those funds to the Debtor that obtained the Mortgage Loan that was the source of the funds involved.

■ Moreover, a bankruptcy judge's view of equitable principles has no place under the Code to the extent the statute clearly addresses an issue. The Bankruptcy Code is a legislative determination of a balance among competing equities, a balance that this Court is bound to respect. *See, e.g., Levit v. Ingersall Rand Financial Corp.*, 874 F.2d 1186, 1198 n. 10 (7th Cir.1989). Because Section 347(b) of the Bankruptcy Code expressly requires return of unclaimed funds to the Debtor, Field's appeal to equity is simply irrelevant.

### The § 1143 five-year limit does not apply here.

Section 1143 of Title 11 provides a time limit sometimes effective for distribution to the debtor referred to in Section 347(b):

"If a plan requires presentment or surrender of a security or the performance of any other act as a condition to participation in distribution under the plan, such action *shall be taken* not later than *five years* after the date of the entry of the order of confirmation. Any entity that has not within such time presented or surrendered such entity's security or taken any such other action that the plan requires may not participate in distribution under the plan." (Emphasis supplied.)

The Plan in this case was confirmed over eight years ago on August 23, 1983.

However, the Committee and its counsel had several problems that delayed the start of their efforts to find creditors who have now disappeared during the long delay. The Committee decided after many years that former counsel for the Committee had not seen to expeditious and efficient administration of the Committee's duties under the Plan. Those counsel were discharged by the Committee, and Mr. Chill was employed as new counsel for the Committee.

The following distributions have been made to unsecured creditors (except for those whose current addresses are not known by the Committee counsel):

*First Distribution of 7%*

Sent to some creditors on August 9, 1985.

Remainder of creditors sent checks November 30, 1988.

*Second Distribution of 8%*—December 26, 1990

*Third Distribution of 10.1%*—August 23, 1991

Thus, the first distribution was partially made about two years after plan confirmation. The remainder of the first distribution, and all other distributions, came after the fifth anniversary of the confirmation order.

■ The Debtor now asserts the five year deadline under § 1143, but asks only that unclaimed funds be paid to the reorganized Debtor by November 30, 1991, which it suggests is a reasonable time to find the missing creditors. However, § 1143 does not apply. Section 1143 "only binds those who must exchange, surrender, or do something with securities to act within a five year period [following confirmation]." Ginsberg, *Bankruptcy: Text, Statutes, Rules* § 13.14[e] (2nd Ed.1990). Even if this provision applies more generally to all acts of creditors in the post-confirmation period by requiring them to perform whatever act may be a condition to participating in the distribution under the plan, it still would not apply in this case. Here, the creditors awaiting their dividend checks had no "act" to perform as a condition to participation in plan distribution. The

Creditors' Committee, on the other hand, had a duty under the Plan to find the creditors and make distributions. Thus, the problem faced by the court is not a § 1143 problem of creditors failing to act, but a § 1142 problem of the Committee failing to make timely distributions.

■ This court has broad authority under §§ 105 and 1142(b) of the Bankruptcy Code to order parties to comply with reorganization plans. Ginsberg, *supra* at § 13.14[e]. See *In re Jorgensen,* 66 B.R. 104, 108 (9th Cir. BAP 1986) ("The court under §§ 105 and 1142(b) can make necessary orders to carry out the provisions of the plan."), and *Matter of Coral Air, Inc.,* 40 B.R. 979, 982 (D.C.V.I.1984) ("[§ 1142] grants the Court power to direct the debtor and any other necessary party to perform any act necessary for the consummation of the plan."). Using this authority courts have ordered debtors to perform a wide variety of acts including appointing an agent for the liquidation of the debtor's property and the distribution of the proceeds, *In re Jorgensen,* 66 B.R. at 108; *In re Harlow Properties, Inc.,* 56 B.R. 794, 798 (9th Cir. BAP 1985), ordering payments to creditors from certain accounts, *Matter of Coral Air,* 40 B.R. at 985, and ordering funds to be held in trust. *Id.*

This Court has discretion to determine a reasonable period of time for distribution of dividends under §§ 105 and 1142(b). In this case, it would be a great injustice to deny creditors their dividend because they lost track of a ten year old bankruptcy case in which the first dividend was not ready for distribution until nine years after the case was first filed. Furthermore, as noted above, § 1143 of the Code cannot possibly be read to allow a debtor to receive a windfall for its own negligence in failing to diligently complete the distributions under the plan, or here for delay occasioned by the Creditors' Committee in carrying out its duties.

If § 1143 were applicable here, then after five years of slow performance by the Committee for Unsecured Creditors, all moneys held for distribution should have been paid to the reorganized Debtor without distribution to any creditors. When the distributions were made more than five years after confirmation, neither the Debtor nor anyone else objected or asserted that such an absurd result was required under § 1143. In June of 1991, the Committee sought to make final distribution to creditors whose addresses are known, and there was no objection by anyone to that.

Although § 1143 does not apply, the Court has responsibility to see that the Committee carries out its duty under the Plan to find the creditors if possible and to pay their dividends.

■ Accordingly, *sua sponte* this Court has heretofore ordered the Committee and its counsel to employ a firm experienced in searching for missing creditors to make such search in this case. The advertisement suggested by the Committee would not be sufficient to find such people, and the search firm is the only effective way to do so. Such a firm was found and Committee counsel moved for approval thereof. That order was recently entered, and the search for missing creditors is now underway. The Trustee has been separately ordered to report the status of that search on January 17, 1992. At that time, the Court expects to set a deadline for the search and will invite input at that time as to what the deadline should be. The debtor is correct in asserting that a lengthy time period is not reasonable under the circumstances.

### Conclusion

A reasonable time will be allowed to search for missing creditors. After that period is up, the unclaimed funds will be paid to the reorganized Debtor.