**In re IBIS CORPORATION, Debtor.**

**No. 92–10941–RGM.**

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Oct. 5, 2001.

Philip J. McNutt, Washington, DC, for debtor.

Brian F. Kenney, McLean, VA, Plan Administrator.

### MEMORANDUM OPINION

ROBERT G. MAYER, Bankruptcy Judge.

This case is before the court to determine the proper disposition of $378,325.34 deposited into the registry of the court. The reorganized chapter 11 debtor asserts that the funds are unclaimed funds that should be paid to it pursuant to §§ 347 and 1143 of the Bankruptcy Code while the creditors assert that the funds should be distributed to them.

IBIS Corporation filed a voluntary petition in bankruptcy pursuant to chapter 11 of the Bankruptcy Code on February 26, 1992. A chapter 11 plan was confirmed on December 7, 1993. The plan provided for

periodic payments to the Plan Trustee, who was responsible for distributing the payments to creditors.[1] The debtor compromised its obligation to make periodic payments by agreeing to make a single payment of $1,075,000 to the Plan Trustee. The compromise was approved by court orders entered on January 19, 1995, and February 21, 1995. The payment was made on February 22, 1995.

The Plan Trustee filed five avoidance actions on February 28, 1994, as he was authorized to do pursuant to the confirmed plan, and 19 objections to proofs of claims on March 23, 1995. On March 10, 1995, prior to the Plan Trustee objecting to the 19 proofs of claims and prior to the resolution of the adversary proceedings, the debtor filed a motion requesting the entry of a Final Decree. The motion was granted and the decree was entered on the docket on March 8, 1996. The Final Decree reserved continuing jurisdiction in this court limited to final disbursement by the Plan Trustee, adversary proceedings then pending and claims objections. The Plan Trustee resolved all of the adversary proceedings and final orders were entered on February 13, 1997. The claims objections were never resolved.

The Plan Trustee made three distributions: August 16, 1994, December 29, 1994, and April 1, 1995. This did not disburse all of the money he had received. As of April 13, 1995, he had $364,675.47 which was withheld from distributions to creditors whose claims were in dispute: $23,122.05 in checks returned by the United States Postal Service as undeliverable; and $8,541.66 in outstanding checks which were neither returned nor cashed. After

---

1. The Plan Trustee was independent of the debtor and acted subject to the advice of the Permanent Creditors' Committee.

April 13, 1995, he received $64,702.00 from settlement of the adversary proceedings.[2]

The Plan Trustee took no significant action to resolve the disputed claims or to locate the missing creditors whose distribution checks were returned in the mail. Except for a change of address notification filed by the Plan Trustee on March 26, 1998, no papers were filed in the bankruptcy case from May 1, 1995, through June 21, 2000, when the debtor moved to reopen the case to seek an accounting and to claim the undistributed funds in the hands of the Plan Trustee. The case was reopened on June 27, 2000. The funds were ordered to be paid into the registry of the court for safe keeping because the Plan Trustee was unable to provide an immediate accounting and appeared to have abandoned his duties. The debtor's motion to require the funds to be distributed to the debtor was continued to allow the debtor, the creditors and the United States Trustee to obtain an accounting from the Plan Trustee. That accounting has been made. After providing his accounting, the Plan Trustee resigned and a successor Plan Trustee was appointed. The debtor's motion is now mature for consideration.

### Debtor's Position

The debtor asserts that all the money in the registry of the court belongs to the debtor and should be disbursed to it.[3] The debtor argues that §§ 347(b) and 1143 provide the rule for decision in this case. Section 347(b) states:

Any security, money, or other property remaining unclaimed at the expiration of the time allowed in a case under chapter 9, 11, or 12 of this title for the presentation of a security or the performance of any other act as a condition to participation in the distribution under any plan confirmed under section 943(b), 1124, 1173, or 1225 of this title, as the case may be, becomes the property of the debtor or of the entity acquiring the assets of the debtor under the plan, as the case may be.

The phrase "the presentation of a security or the performance of any other act as a condition to participation in the distribution" in § 347(b) is substantially repeated in § 1143 which states:

If a plan requires presentment or surrender of a security or the performance of any other act as a condition to participation in distribution under the plan, such action shall be taken not later than five years after the date of the entry of the order of confirmation. Any entity that has not within such time presented or surrendered such entity's security or taken any such other action that the plan requires may not participate in distribution under the plan.

IBIS argues that a creditor's "performance of any other act as a condition to participation in distribution under the plan" includes cashing distribution checks received, keeping the Plan Trustee advised of any change of address and resolving any objection to its claim. Since the creditors did not satisfy these requirements within five years after confirmation, the funds that would otherwise have been distributed to them became the debtor's property no

---

**2.** In addition, interest has accrued on the account. The total exceeds the amount paid into the registry of the court because the Internal Revenue Service levied on the account in April 1999 for post-confirmation taxes due by the reorganized debtor. The levy was $162.290.84. The Plan Trustee did nothing to recover the levied funds.

**3.** It follows that the fund belonged to the debtor at the time of the IRS levy, that the levy was proper to satisfy IBIS' post-confirmation tax liability and that IBIS is not liable to the Plan Trustee for the amount seized by the IRS.

later than February 21, 2000, and possibly as early as December 7, 1998.[4]

### Creditors' Position

The creditors assert that the time limit contained in §§ 347(b) and 1143 is not applicable because they are not required to do anything, that is, they may safely sit back, do nothing and wait for a distribution. No security is required to be presented or surrendered. No act is required to be performed as a condition precedent to participation in the distribution under the confirmed plan. Consequently, the funds in the registry of the court should be distributed to them. Moreover, to the extent that some creditors have not cashed distribution checks, those funds should be redistributed among the remaining creditors because the plan provides that all distributions will be *pro rata* among the creditors.

### Discussion

■■■ Bankruptcy Code §§ 347(b) and 1143 control the disposition of unclaimed funds in the registry of the court.[5] The plain language of § 347(b) when read in conjunction with § 1143 provides that unclaimed funds become property of the debtor five years after confirmation. There are only two conditions precedent to the application of § 347(b): (i) that the funds be unclaimed and (ii) that five years have elapsed after confirmation. If these two conditions have been met, then the unclaimed funds belong to the debtor. *See TLI, Inc. v. Lynn (In re TLI, Inc.)*, 213 B.R. 946, 950, 954 (N.D.Tex.1997) *aff'd* 159 F.3d 1355 (5th Cir.1998) (Table); *In re Goldblatt Bros., Inc.*, 132 B.R. 736, 738 (Bankr.N.D.Ill.1991). A third condition is added by § 1143. If a plan requires presentment or surrender of a security or the performance of any other act as a condition to participation in the distribution under the plan, the action must be taken within the five-year period. If the action is not taken within the five-year period, the creditor or security holder is barred from participating in the distribution under the plan. Section 1143 acts as a bar date to take certain actions. *See Duebler v. Sherneth Corp.*, 160 F.2d 472, 474 (2nd Cir. 1947) (decided under §§ 204 and 205 of the Bankruptcy Act of 1898).

This case presents two issues: whether the funds in the registry of the court are unclaimed and whether the creditors were required to take any specific action in order to be eligible to participate in the distribution under the plan. If they were required to take any actions, it is conceded that they have not and are now time-barred from doing so.

### Requirement of Performance of an Act

■■■ The creditors assert that they were not required to perform any act and con-

---

4. It does not matter in this case whether the five-year period set forth in § 1143 starts anew upon entry of the order modifying the confirmed plan because the acts identified by the debtor were not performed within five years of the later order.

5. The confirmed plan of reorganization makes no provision for the circumstances presented by this case. It is, therefore, unnecessary to decide whether the five-year deadline can be reduced or extended in a chapter 11 plan. *See TLI, Inc. v. Lynn (In re TLI, Inc.)*, 213 B.R. 946, 949 (N.D.Tex.1997) (plan provided that property remaining unclaimed after the later of three years after confirmation, or 60 days after the final order allowing the claim, would return to claims fund for distribution to other claimants); *In re Goldblatt Bros., Inc.*, 132 B.R. 736, 739 (Bankr.N.D.Ill.1991) (as an alternative holding, assumed without deciding that a confirmed plan could override express requirements of § 347(b)); *In re George Rodman, Inc.*, 50 B.R. 313, 314 (Bankr.W.D.Ok.1985) ("Since no period has be fixed in this case, by implication the trustee holds the funds for the maximum [five-year] period.")

clude, therefore, that § 347(b) is not applicable. The debtor argues that they were required to do several things. They were required to resolve their claims, cash their distribution checks, and maintain contact with the Plan Trustee, that is provide the Plan Trustee with a current address and apprize him of any change of address. If these actions are required to be performed by the creditors, it is conceded that they were not completed within five-years after confirmation, are now time barred under § 1143 and cannot now be performed. The funds would, therefore, be paid to the debtor.

■ The terms of the confirmed plan determine whether a creditor is required to take any action in order to participate in the distribution under the confirmed plan. The plan in this case does not contain any such requirement. The plan only requires the debtor to make payments to the Plan Trustee and the Plan Trustee to distribute the payments to the creditors. Nothing in the plan requires the creditors to do anything in order to participate in the Plan Trustee's distribution.

■ The debtor argues that the plan implicitly required creditors to take certain actions within the five-year period. Section 1143 cannot be read to impose implicit requirements on creditors and security holders. To do so would permit unwary creditors to be ensnared in hidden traps. Creditors are entitled to fair notice of the terms of a plan affecting their ability to participate in the plan. *See In re Linkous,* 990 F.2d 160, 162 (4th Cir.1993). They cannot be required to construe a plan or guess as to the eligibility requirements to participate in the plan.

In any event, the implicit requirements suggested by the debtor are inconsistent with § 1143. None of the three implicit duties suggested by the debtor—resolving objections to claims, cashing distribution checks and maintaining a current mailing address with the Plan Trustee—are the kind of requirements addressed by § 1143 itself. Neither cashing the distribution check nor maintaining a current address is necessary to establish *eligibility* to participate in the distribution under the plan. In fact, three distributions were made within five years after confirmation, none of which is challenged by the debtor. Clearly, the creditors to whom those distributions were mailed have done everything required to be eligible for participation in distributions under the plan. This is true even if the checks were never cashed or were returned to the Plan Trustee by the Postal Service. The checks would never have been mailed to the creditors if they were not eligible to receive them. Whether the uncashed or undelivered checks are now *unclaimed* is a different issue. *But see In re George Rodman, Inc.,* 50 B.R. 313 (Bankr.W.D.Ok.1985) (holding that cashing a check is an act required by § 1143).[6]

6. The court is aware of the reference to cashing checks in the legislative history. S.Rep. No. 95–989 (1978) at 48, U.S.Code Cong. & Admin.News 1978, at 5787, 5834 ("Conditions to participation under a plan include such acts as cashing a check, surrendering securities for cancellation, and so on."). If the legislative history were considered, the court would not give it significant weight. The comment is somewhat misplaced. It appears as an explanation to § 347, not § 1143. Section 347 only addresses unclaimed funds.

Section 1143 addresses actions required to be taken in order to participate in a distribution under a plan. The brief passage does not reflect a considered interpretation of either § 347 or § 1143. It is illustrative only and not explanatory. Collier's suggests the passage is "unfortunate language." 8 Lawrence P. King et al., Collier on Bankruptcy, ¶ 1143.03[3] n. 2 (15th ed. rev.2000). Collier's concludes that cashing a check is not a requirement of § 1143. *Id.* at ¶ 143.03[3]. The Senate Report statement may well accu-

No distribution was made to creditors whose claims were objected to by the Plan Trustee. The debtor asserts that these creditors were required to resolve their claims within five years after confirmation;[7] otherwise the funds reserved for them pending resolution of their claims become the debtor's on the expiration of the five-year period. The claims allowance process is carefully and specifically provided for in the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure. 11 U.S.C. §§ 501, 502; Fed.R.Bankr.P. 3001–3008. It imposes no deadline on the completion of litigation over objections to claims. Section 1143, on the other hand, is a general statutory provision. If there is a conflict between the specific Code and Rule provisions governing the claims allowance process, and the more general provisions of § 1143, the more general provisions of § 1143 must yield to the more specific claims allowance provisions. If § 1143 were to include an unexpressed time requirement to resolve all objections to a creditor's claim, the Code would place an arbitrary limitation on a creditor which may not be within the control of the creditor to satisfy. While most claims litigation is of brief duration, some can become quite contentious and take a substantial period of time to resolve, particularly if there are appeals. A creditor should not be prejudiced because he runs out of time to complete complex litigation. Moreover, such a rule would unfairly benefit dilatory or ob-

streperous debtors. The debtor's argument that § 1143 imposes a five-year deadline on completion of the claims objection process makes no distinction between simple claims litigation that can be completed within the five-year time period and complex claims litigation that might not be completed within the time period. It does not take into account an exception for complex litigation or objections filed long after confirmations[8] and—because it is an absolute deadline—cannot include an exception for claims litigation diligently pursued. For these reasons, the claims allowance process cannot be governed by or limited by § 1143. A code provision that does not specifically address the claims allowance process should not implicitly set limitations on it.

The three implicit acts suggested by the debtor to be required by § 1143 are acts that may in some cases be required to be performed after the five-year period has expired. Cashing distribution checks issued more than five years after confirmation cannot reasonably be included within the provisions § 1143. Such provisions are not uncommon and were not foreseen by Congress in enacting the Bankruptcy Code. Priority tax claims may be paid over a six-year period after assessment, a period which may extend more than five years after confirmation. 11 U.S.C. § 1129(a)(9)(C). Many confirmed chapter 11 plans anticipate distributions

rately state the result in many cases. An uncashed check may revert to the debtor, not because the creditor failed to perform an act within five years—e.g., cashing the check—but because at the expiration of the five-year period the funds were unclaimed. This court reaches that conclusion as to some of the funds in issue. The Senate report presumably assumed that the check is received by the creditor.

7. A claim is allowed unless an objection has been filed. 11 U.S.C. § 502(a).

8. In some cases, particularly where funding for the distribution depends on the liquidation of an asset, debtors may not object to claims until the asset is sold and it is clear that there will be funds available to pay creditors. Earlier objections may result in useless expenses for both the debtor and the creditors if there is no money to distribute. Neither the Bankruptcy Code nor the Bankruptcy Rules establish a deadline to object to claims. There is no bar date unless set by the court.

being made more than five years after confirmation. The initial 10–year duration of the plan in this case is not unusual. The debtor's argument that distribution checks must be cashed within five years after confirmation does not address distribution checks issued more than five years after confirmation. Nor is there any way to account for them under the debtor's construction of § 1143. Similarly, a creditor may move after the expiration of the five-year period. He would not be able to apprize the Plan Trustee of the new address within the five-year period. As discussed above, objections to claims may be made very late or may take a long time to resolve, both of which through no fault of the creditor, may extend beyond five years after confirmation.

The court finds that neither the plan itself nor § 347(b) read in conjunction with § 1143 impose any requirement, either explicit or implicit, on any creditor to take any act within five years after confirmation. *Goldblatt*, 132 B.R. at 740–41. Both the debtor's argument—that any such hypothetical act cannot now be accomplished, thereby causing the funds in the registry of the court to revert to the debtor—and the creditors' argument—that §§ 347(b) and 1143 are irrelevant because no act is required to participate in the distribution—miss the point. The purpose of § 347 is to deal with *unclaimed* funds that exist at a certain time. In a chapter 11 case, that time is five years after confirmation. The focus in this case should not be on any acts required to be performed—there are none—but whether there are *unclaimed* funds. There are certainly funds in the registry of the court, but are they *unclaimed?*

### Unclaimed Funds

■■ Funds are unclaimed when the disbursement agent, which may be the reorganized debtor, has done everything he is required to do to distribute the funds, reasonable notice of the availability of the funds has been given to the intended recipient and the intended recipient has done nothing for a period of time sufficient to evince a lack of interest in the funds or an abandonment of his right to the funds. For example, a check mailed to a creditor at the creditor's last known address, not returned by the Postal Service and not cashed within a reasonable period of time is unclaimed. Mailing the check is the last act the disbursement agent is required to perform in order to pay the creditor's claim. It is presumed that mail properly addressed is delivered to the addressee. It, therefore, constitutes notice of the availability of the funds. *See, e.g., Hagner v. United States*, 285 U.S. 427, 430, 52 S.Ct. 417, 419, 76 L.Ed. 861, 864 (1932); Russell, Bankruptcy Evidence Manual. (2001 ed.), § 301.8. The failure to cash the check within a reasonable time evinces an absence of interest or an abandonment of the creditor's right to the funds. *Cf. TLI*, 213 B.R. at 956 (reaching the same result but holding that cashing a distribution check is an act required by § 1143). This rule is more satisfactory than holding that cashing a check is an act required by § 1143. An act required to be performed under § 1143 must be performed within five years after confirmation and does not address checks that are not issued until more than five years after distribution. The rule expressed in this case applies to all checks, whenever issued. Of course, checks issued earlier than five years after confirmation and neither cashed nor returned would not revert to the debtor until the expiration of the five-year deadline.

■■ A check that is returned in the mail does not satisfy the requirements for unclaimed funds. The presumption of delivery cannot be sustained because the mail was itself returned. Consequently, it

cannot be presumed that the creditor was aware of the availability of the funds. In these circumstances, the disbursement agent must exercise due diligence in attempting to locate the creditor. *Goldblatt,* 132 B.R. at 741. If after a reasonable search, reasonable notice, and the passage of a reasonable period of time within which it would be expected that an interested creditor would seek out the disbursement agent, the creditor cannot be found or does not appear, it may be presumed that the funds are unclaimed.

The debtor argues that the Plan Trustee's failure to distribute the funds within the five-year period [9] renders the funds unclaimed for purposes of § 347(b).[10] The difficulty with this argument is simply that the Plan Trustee is not a creditor. He is an independent third party. His actions or inactions do not determine whether the creditors have left money unclaimed. The funds in his hands are certainly unpaid

funds, but not necessarily unclaimed funds. Recognizing this limitation, the debtor seeks to attribute the Plan Trustee's failure to timely discharge his duties to the creditors. This attribution is somewhat circuitous. The debtor asserts that the Plan Trustee was under the control and direction of a the Permanent Creditors' Committee, that this control imposed an obligation on the Permanent Creditors' Committee to supervise the Plan Trustee and to assure that he timely discharged his obligations and that the Committee failed to do so. Finally, if this obligation to act cannot be further attributed to all creditors, at least the creditors on the Permanent Creditors' Committee should be charged with it and be barred from participation in further distributions under the plan.

 This argument cannot be accepted.[11] The Permanent Creditors' Commit-

---

9. The five-year period is relevant for only two purposes. First, if the five-year period had not expired the creditors could still successfully claim the funds. Second, five years is a lengthy time. It is an indicia of a creditor's lack of interest and, hence, the fact that the funds are unclaimed.

10. Section 1143 does not address whether funds are unclaimed, only the time limit within which certain actions must be taken. Even if applicable here, it addresses creditor responsibilities, not the administrative responsibilities of a plan administrator. The failure of a plan administrator to properly and promptly discharge his duties is different from the requirement of § 1143 for the creditors to take particular actions in order to be eligible to receive a distribution from an estate. Section 1143 is directed to those actions a creditor is required to take to in order to qualify for participate in a distribution under the plan, not to the actions required by the plan administrator in preparing for or in making a distribution.

11. The debtor casts this argument more in the nature of a § 1143 argument, actions required within five years after confirmation.

It is quite clear that the Permanent Creditors' Committee's supervisory obligations would not have been completed within five years after confirmation because the original plan was itself a ten-year plan. The debtor's argument suggests that the obvious impossibility of the Permanent Creditors' Committee performing its supervisory duties that would have been performed after the fifth year within the first five-year period would result in any funds that would otherwise have been paid after the fifth year to revert to the debtor. The better interpretation of the plan is that these duties—whenever performed, if ever performed—are not required in order for creditors to "participate in distribution under the plan." They are the administrative actions necessary to properly administer the plan and while they are necessary to create the fund to be distributed and to properly distribute it to the creditors, they are not actions creditors must take in order to be able to participate. Section 1143 relates to those acts required by creditors to participate in the distribution under the plan that establish their *qualification* to receive distributions. It does not include administrative actions that may be required to *effect* the distribution. Once a

tee does have supervisory duties but its failure to discharge its duties does not mean that all creditors abandoned their interest in receiving a distribution or do not claim funds that may be due to them. *Goldblatt*, 132 B.R. at 741. That is especially true here where the Permanent Creditors' Committee appears to have dissolved without notice to the creditors. During the past five or six years, no meetings were held by the Committee; the Plan Trustee did not consult the Committee; and there were no communications between the Plan Trustee and the Committee or between the creditors and the Committee. The Committee members were employees of corporate creditors. In many instances, it appears that the members are no longer employed by the corporate creditor. During this time, counsel for one creditor, the Department of the Army, informally asked the Plan Trustee what was happening and when distributions could be expected. The Plan Trustee always indicated that he was still active and was resolving matters. While the comments were vague, they were sufficient to reassure counsel. These circumstances do not indicate that the money due to the creditors is unclaimed. The creditors do claim the money. They were merely waiting for the Plan Trustee to resolve administrative matters. They expected a distribution when it was available. They did not know that the Plan Trustee had effectively abandoned his duties or that the Permanent Creditors' Committee had effectively disbanded. This is brought home by the creditors' responses to the debtor's motion to disburse the funds in the registry of the court to the debtor. They re-

established the Permanent Creditors' Committee which has hired counsel and which is actively involved in opposing this motion. Many have hired individual counsel who are actively engaged in opposing the motion. The failure of the Plan Trustee or of the Permanent Creditors' Committee to properly discharge their duties cannot prejudice the creditors or cause the funds to be unclaimed. *In re The Signature Group*, 172 B.R. 501, 502 (Bankr. D.R.I.1994). Whether the funds are unclaimed depends on the actions or inactions of the individual creditors, not the Plan Trustee or the Permanent Creditors' Committee.

■ The debtor argues that the creditors' failure to prosecute the claims objections evinces their disinterest in the funds and shows that the funds of these creditors are unclaimed. Claims are allowed unless an objection is filed. 11 U.S.C. § 502(a). The Plan Trustee filed 19 objections to claims on March 23, 1995. No response was filed to 18 of the objections. None has ever been resolved. The Plan Trustee did not make a distribution to any of the 19 creditors, but did withhold funds sufficient to pay them if his objections were ultimately overruled. The debtor asserts that the failure to resolve the claims renders the funds reserved for payment of the claims unclaimed.

While the failure of a creditor to resolve an objection to its claim within a reasonable time is arguably a factor in determining whether the creditor has abandoned its claim[12] the debtor's argument fails in this case for several reasons. First, a final decree was entered on May 1, 1995, and

creditor has done everything the plan requires to qualify to receive a distribution, there is no requirement imposed under § 1143 to take any further action.

12. It can be more plausibly argued that the party objecting to the claim has abandoned the objection and that the objection—not the proof of claim—should be dismissed for failure to prosecute in which case the claim would be allowed.

the case was closed. At that time the objections to claims were outstanding and unresolved. While the plan reserved jurisdiction in this court to adjudicate all controversies regarding the classification or allowance of claims, such an adjudication can only be made while the case is pending, that is, open.[13] The plan did not confer jurisdiction on the court to hear the then-pending objections after the case was closed. *Mason v. Hitchcock,* 108 F.2d 134 (1st Cir.1939); *Holly's, Inc. v. City of Kentwood (In re Holly's, Inc.),* 172 B.R. 545 (Bankr.W.D.Mich.1994). It merely provided a mechanism that would enable the court to re-open the case to make these determinations if the occasion arose. The objections became moot when the case was closed. The claims became allowed claims at that time.

Second, the creditors were under no obligation to respond to the objections because none was properly served. Sixteen of the creditors whose claims were objected to are corporations. Objections to proofs of claims are contested matters governed by Fed.R.Bankr.P. 9014. The objection must be served in accordance with Fed.R.Bankr.P. 7004. Rule 7004(b)(3) provides for service:

> upon a domestic or foreign corporation or upon a partnership or other unincorporated association, by mailing a copy of the summons and complaint to the attention of an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process and, if the agent is one authorized by statute to

receive service and the statute so requires, by also mailing a copy to the defendant.

Here, none of the objections to corporate claims was served as required by Rule 7004(b)(3). *See In re Boykin,* 246 B.R. 825 (Bankr.E.D.Va.2000). None of the creditors had any obligation to respond to the objection to its claim or to take any action to resolve it.

The Plan Trustee objected to three proofs of claims filed by governmental units: Fairfax County, Virginia; the Town of Herndon, Virginia; and South Burlington, Vermont. These objections were also not properly served. The objection to the proof of claim filed by Fairfax County was addressed and mailed to "County of Fairfax, Office of Finance" at a specific street address. Fed.R.Bankr.P. 7004(a)(6) provides that service on a state or municipal corporation or other governmental organization may be made:

> by mailing a copy of the summons and complaint to the person or office upon whom process is prescribed to be served by the law of the state in which service is made when an action is brought against such a defendant in the courts of general jurisdiction of that state, or in the absence of the designation of any such person or office by state law, then to the chief executive officer thereof.

Service of process on a Virginia city, county or town is governed by § 8.01–300 of the Code of Virginia. Service is made upon the city, county or town attorney if there is such a position, otherwise on the mayor, manager or trustee of a town or

---

13. The Final Decree states that this court's continuing jurisdiction is "limited to final disbursement by the Plan Administrator, objections to claims, and adversary proceedings currently pending herein." This provision does not change the requirement that matters relating to disbursements and objections to claims be adjudicated in a pending case, that is, that the case be re-opened to consider such matters. The closing of a case does not itself moot or cause the dismissal of an adversary proceeding. Adversary proceedings are independent of the main case and continue to completion notwithstanding the closing of bankruptcy case. *In re Higgins,* 161 B.R. 993 n. 4 (W.D.Mo.1993).

city, or in the case of a county, the Commonwealth attorney. In Vermont, service of process is made upon a city by delivering a copy of the summons and complaint to the clerk, treasurer or manager. Vt. Code R.Civ.P. 4(d)(5). None of the three governmental units was properly served. As with the corporate creditors, none had an obligation to respond to the objection.[14]

The debtor's argument has a final flaw. If the objections to the claims were sustained, the reserved funds would be distributed to all other creditors. All unsecured creditors receive a *pro rata* distribution. This means that they share in accordance to their claims among all allowed claims. If a claim is disallowed, the distribution that would have gone to that creditor had its claim been allowed does not revert to the debtor, but is distributed among the remaining creditors with allowed claims. The disallowance of a claim decreases the size of the pot of allowed claims, thereby increasing each remaining creditor's share in the distribution. If the creditors whose claims were objected to were disallowed, the reserved funds are not unclaimed, but should be distributed to the remaining creditors. Only if a remaining creditor leaves his share unclaimed would that unclaimed share revert to the debtor under § 347(b).

### Application to Registry Funds

The funds in the registry of the court may be divided into several categories. The first group consists of outstanding checks that were mailed and delivered but neither returned nor cashed. This consists of checks in the amount of $8,541.66. These checks have been outstanding for many years and are by any definition stale. The Plan Trustee did everything he was required to do and the creditors, because the checks were presumably delivered to them, are presumed to have had notice of the availability of the funds. The creditors presumably decided not to cash them. These funds are unclaimed.

The next group of funds consists of checks returned by the Postal Service as undeliverable. They amount to $23,122.05. This group cannot be accorded the presumption given to the funds in the first group—that the checks were delivered to the creditors. It may be that some of the funds in this group will become unclaimed, but notice must first be given to the creditor that its distribution is available. Since the addresses were not good addresses when the checks were mailed, the Plan Trustee must undertake a good faith search for the creditors. *See Goldblatt*, 132 B.R. at 741 ("the Creditors' Committee ... had a duty under the Plan to find the creditors and make distributions."); *Rodman*, 50 B.R. at 313 (the trustee made diligent efforts to locate missing creditors). The failure of the original Plan Trustee to undertake a due diligent search cannot prejudice the rights of creditors to receive distributions when they were unaware that there was a distribution to be received.[15]

14. The Plan Trustee did not set the objections for hearing and did not give a negative notice, that is, notice that unless the creditor requested a hearing or filed an opposition within a fixed time, the claim would be disallowed.

15. The debtor argues that the missing creditors have a continuing a duty to keep the Plan Trustee apprized of their current addresses and that the failure to do so is either a failure to perform an act required under § 1143 or is a factor to be considered in determining whether the funds are unclaimed. The § 1143 argument has been addressed above. While there is such a responsibility, as a practical matter, it is well known that many chapter 11 plans are not completed as intended. Many creditors, not expecting anything significant, do not remember to notify the debtor or the disbursing agent of a change of address. Balancing the creditor's responsibility with reality requires the Plan Trustee to undertake

Here the five-year period has passed. After a reasonable search for these missing creditors and notice sufficient under the circumstances, any funds due to the then-still missing creditors may be deemed to be unclaimed. *Goldblatt,* 132 B.R. at 737, 741 (trustee had published a notice giving missing creditors notice that unclaimed funds remaining on a fixed date would be paid to debtor; court imposed additional requirement to employ firm experienced in searching for missing creditors); *Rodman,* 50 B.R. at 314; *In re Riverside Nursing Home,* 137 B.R. 134, 138 (Bankr.S.D.N.Y. 1992) (relying on § 1142(b) to order reorganized debtor to perform an act necessary for the consummation of the plan).

The last group of creditors consists of those from whom the Plan Trustee was withholding distribution because he had objected to their proofs of claims. This accounts for $364,675.47. While it is appropriate for the Plan Trustee to reserve funds from the distributions to pay creditors if their claims are subsequently allowed, the failure to resolve these claims or to pay the funds to the creditors does not affect their rights to their distributions. The funds are not unclaimed. Unless the new Plan Trustee files and properly serves new objections to the proofs of claims within a reasonable time, the reserved funds must be distributed to the creditors.

### Redistribution of Unclaimed Funds Among Creditors

■ An additional creditors' argument remains: Unclaimed funds should be reallocated among the creditors still active in the case and should not be paid to the debtor. The creditors argue that the funds should be reallocated because the plan provides that the funds will be distributed to the creditors *pro rata,* that is, that the confirmed plan modifies the statutory scheme of returning unclaimed funds to the debtor by requiring that the funds be distributed pro rata among all creditors. The unclaimed funds, they argue, should be redistributed among all creditors who received and cashed their distribution check. This proposition was rejected in *Goldblatt* and *Rodman.*

There have been unclaimed funds since the enactment of the Bankruptcy Act in 1898. The failure to claim funds may be deliberate. Some creditors may consider a small distribution too costly to process or return. The cost to identify an account, record the payment and process the check may exceed the distribution. Other creditors may have been paid in full by a third party. Often the failure to claim funds is not deliberate. The creditor has simply moved or the debtor initially provided a bad address. The creditor may not know that there is money available to satisfy his claim in full or in part. However, there must be finality. *See TLI,* 213 B.R. at 956; *Goldblatt,* 132 B.R. at 738. The trustee must make a final accounting. The court must close the case. The debtor is entitled to a fresh start unfettered by past entanglements.

There are four principle possible dispositions of unclaimed funds: they can be held by someone indefinitely for the benefit of the creditor; they can escheat to the government, either federal or state; they can

a reasonable effort to locate missing creditors and to give some notice, perhaps by publication, before the creditor's failure should be given significant weight in determining whether the funds can be deemed to be unclaimed. It may be appropriate to charge any expenses of attempting to locate the missing

creditors against this portion of the fund. Other creditors who have maintained contact with the Plan Trustee should not be disadvantaged by actions designed to assure the proper treatment of the missing creditors. That, however, is a matter that need not be resolved today.

be redistributed among the participating creditors; or they can be returned to the debtor or the debtor's successor. Different schemes were adopted by Congress for chapter VII and XIII case than for reorganization cases. Initially, Congress chose the redistribution scheme in chapter VII and chapter XIII cases. The Bankruptcy Act of 1898 provided that dividends remaining unclaimed for six months after the final dividend were to be paid into the court. Bankruptcy Act of July 1, 1898, ch. 541, § 66a, 30 Stat. 544 (repealed 1978); 3 Collier on Bankruptcy ¶ 347.LH, at 347–11 (15th ed. rev., 2000). Dividends unclaimed after one year were redistributed to the remaining creditors. If those creditors were paid in full, together with interest, the surplus was returned to the debtor. Bankruptcy Act of July 1, 1898, ch. 541, § 66b, 30 Stat. 544 (repealed 1978); 3 Collier on Bankruptcy ¶ 347.LH[1], at 347–13 (15th ed. rev., 2000). In 1938, § 66 was amended to include all unclaimed money, not just dividends.

This system was altered in 1956 when § 66b was repealed. *See* Act of August 1, 1956, Pub.L. No. 84–868. The redistribution scheme was changed to the stakeholder scheme with the United States Treasury being the ultimate stakeholder for unclaimed funds. Unclaimed funds were deposited into the registry of the court and held pursuant to 28 U.S.C. § 2042, which provides that after the funds have been held in the registry of the court for five years, they are deposited to the Treasury in the name and to the credit of the United States. The rightful owner, however, may claim the deposited funds. This amendment eliminated unclaimed funds from escheating to the states and made the disposition of unclaimed bankruptcy funds uniform throughout the United States. It also brought the procedures for handling unclaimed bankruptcy funds into the same system as district courts

used for other unclaimed funds. The redistribution to the more diligent creditors was abolished because redistributions were, in fact, unusual and produced undesirable results in some cases. 3 Collier on Bankruptcy ¶ 347.LH[2], at 347–15 (15th ed. rev., 2000). The Bankruptcy Code of 1978 essentially continued this same treatment of unclaimed funds in chapter 7 and 13 cases. *See* 11 U.S.C. § 347(a).

Sections 347(b) and 1143 of the Bankruptcy Code relate to unclaimed funds in chapter 11 cases and are derived from §§ 204 and 205 of the Bankruptcy Act. Section 204 stated:

Upon distribution, as provided in section 224 of this Act, the judge may, upon notice to all persons affected, fix a time, to expire not sooner than five years after the final decree closing the estate, within which, as provided in the plan or final decree—

(1) the creditors, other than holders of securities, shall file, assign, transfer, or release their claims; and

(2) the holders of securities shall present or surrender their securities. After such time no such claim or stock shall participate in the distribution under the plan.

Section 205 stated:

The securities or cash remaining unclaimed at the expiration of the time fixed as provided in section 204 of this Act, or of any extension thereof, shall become the property of the debtor or of the new corporation acquiring the assets of the debtor under the plan, as the case may be, free and clear of any and all claims and interests.

Congress rejected, in chapter 11 cases, the redistribution of unclaimed funds to the remaining participating creditors, the escheat of unclaimed funds to either the federal or state governments and the hold-

ing of the funds by a stakeholder for an indefinite period of time. This is especially apparent from the legislative history and from a comparison of the statutory scheme for unclaimed funds in chapter 7 and 13 cases the statutory scheme in chapter 11 cases. The Bankruptcy Code continued the practice under the Bankruptcy Act of returning unclaimed funds to the debtor.

With this legislative history, a provision in a chapter 11 plan that deviates from the preferred statutory scheme must be clear. Here is it not. The requirement in this plan is directed to assuring that the distribution to creditors will be *pro rata* among the creditors. The distribution scheme does not affect the reversion of unclaimed funds to the debtor.

### *The IRS Levy*

 There is one final matter to be considered. The debtor is entitled to at least $8,541.66 in unclaimed funds; however, in April, 1999, the IRS levied on the Plan Trustee's bank account to satisfy recent unpaid federal taxes of the reorganized debtor. The IRS seized $162,290.84. These funds were property of the creditors, not the debtor. While the debtor was aware of the levy and determined that the source of the funds was from the creditors' fund, neither the debtor nor the Plan Trustee took any action to correct the situation. The levy was improper in that the money seized belonged not to the reorganized debtor but to the creditors. Had the debtor or the Plan Trustee taken any action with respect to the levy, the funds seized would have been restored to the creditors' fund. As it stands, the debtor has been unjustly enriched by the improper levy and its failure to take any action to restore the creditors' money to the Plan Trustee. While the debtor has a duty to restore the funds that improperly benefitted it, as a matter of equity, the Plan

Trustee will set off the amount of unclaimed funds that would otherwise have reverted to the debtor against the amount seized by the IRS plus interest that would otherwise have been earned by the Plan Trustee. The set off will not affect the obligation of the debtor to repay the balance of the funds required to make the Plan Trustee whole.

### *Conclusion*

The debtor's motion will be denied except for $8,541.66. The funds held in the registry of the court will be disbursed to the new Plan Trustee for distribution in accordance with this opinion. Subject to the setoff of the funds levied by the IRS plus interest, unclaimed funds will revert to the debtor.